# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MYRON A. GLADNEY,

                Plaintiff,

v.

NATHANIEL SILVA, THOMAS
NELSON, JOHN DOE, KYLE
DEMERS, MARCO STEPHENSON,
YANA PUSICH, and NATHAN
PACH,

                Defendants.

Case No. 24-CV-764-JPS

**ORDER**

     Plaintiff Myron A. Gladney, an inmate confined at Kettle Moraine Correctional Institution, filed a pro se complaint under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights. ECF No. 1. On September 24, 2024, the Court screened the complaint and ordered service on Defendants. ECF No. 10. On December 11, 2024, the Court entered a scheduling order that included a ninety-day deadline to identify the Doe defendants. ECF No. 18. On March 24, 2025, Plaintiff filed a motion for an extension of time to file an amended complaint to identify the Does. ECF No. 20. On April 1, 2025, the Court granted Plaintiff an extension of time until May 16, 2025, to identify the Does. ECF No. 22.

     Now pending before the Court are: (1) Plaintiff's motion to compel, ECF No. 23; (2) Plaintiff's motion for an order for default sanctions and reimbursement of costs, ECF No. 25; (3) Defendants' motion to withdraw as attorney and motion to revoke acceptance of service for Defendant Nathaniel Silva, ECF No. 27; (4) Plaintiff's motion to intervene to help

properly identify the Doe defendants, ECF No. 31; (5) Defendants' motion to rescind their prior motion to withdraw and a motion for consideration of other materials in response to Plaintiff's motion for sanctions, ECF No. 34; (6) Plaintiff's motion to file an amended complaint, ECF No. 38, with a proposed amended complaint attached, ECF No. 38-1; (7) Plaintiff's motion to appoint a medical expert, ECF No. 42; (8) Plaintiff's motion to appoint counsel, ECF No. 47; and (9) Plaintiff's second motion to appoint a medical expert, ECF No. 49.

## 1.      PRELIMINARY ISSUES

First, the Court will grant Defendants' motion to rescind their motion to withdraw their prior motion regarding Defendant Silva and to consider additional information, ECF No. 34. Counsel for Defendants previously sought to withdraw his representation of Defendant Silva based on Silva's failure to communicate with counsel. ECF No. 27. Now, counsel seeks to rescind that motion because Silva has appeared and responded to outstanding discovery requests. ECF No. 34. Silva submitted a declaration indicating that he had medical issues that interfered with his communication with counsel and that he had inadvertently failed to provide updated contact information. ECF No. 36. The Court will therefore grant Defendant's motion to rescind and will instruct the Clerk of Court to strike Defendants' prior motion to withdraw representation.

Second, the Court will deny Plaintiff's motion for default sanctions and motion to compel. ECF Nos. 23, 25. A district court may dismiss a case for discovery violations or other egregious conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court. *See Greviskes v. Univ. Research Assoc., Inc.*, 417 F.3d 752, 758–59 (7th Cir.2005) (citations omitted). Rule 37(b) allows dismissal of an action

as a sanction if a party "fails to obey an order to provide or permit discovery," Fed. R. Civ. P. 37(b)(2)(A)(v). A district court may dismiss a case as a sanction for discovery abuse if it finds that the party's actions displayed willfulness, bad faith, or fault, and if dismissal would be a proportionate response to the circumstances. *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir.2009). Even if Rule 37 did not apply, however, it is well settled that federal courts have inherent powers to sanction litigants for conduct that abuses the judicial process. These powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991) (citation omitted). Under these powers, courts can impose sanctions including default judgments and shifting attorney's fees. *See id.* at 44–45.

Here, Plaintiff's request for sanctions under Rule 37 was premature because the Court has not issued an order regarding discovery that Defendants failed to comply with. Further, sanctions under the Court's inherent authority are not warranted in this instance. Defendants have provided a thorough explanation of Defendant Silva's earlier failure to communicate with his counsel and have since remedied the issue. More importantly, Plaintiff will not be prejudiced by any delay because, as discussed below, Plaintiff's amended complaint requires the Court to amend the scheduling order and allow for additional discovery in light of Plaintiff's newly added defendants.

As a result of the amended complaint, the Court will also deny Plaintiff's motion to compel as moot in light of the new defendants and additional time to complete discovery. The Court notes, parenthetically, however, that it is highly unlikely that the Court would order Defendants

to produce documents related to *all* inmate complaints made against all defendants. Information "need not be admissible in evidence to be discoverable," but it must be relevant to a claim or defense and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In *Cooper v. Meyer*, No. 16-CV-526-JDP, 2018 WL 1400956, (W.D. Wis. Mar. 19, 2018), a district court denied a plaintiff's motion to compel all excessive force inmate complaints against defendant prison officials. *Id.* at *3. The court noted that, in most circumstances, unfounded complaints "would not tend to make it more probable that defendants actually used excessive force." While this likely would be the case here, Plaintiff may raise this argument later to the extent he believes that Defendants have not adequately responded to future discovery requests. In the meantime, the Court encourages the parties to continue to work together to resolve discovery issues without Court involvement.

Third, the Court will deny Plaintiff's motions for a court appointed expert. ECF Nos. 42, 49. "A court may, in its discretion, appoint an expert witness where the expert's 'specialized knowledge will assist the trier-of-fact to understand the evidence or decide a fact in issue.'" *Giles v. Godinez*, 914 F.3d 1040, 1053 (7th Cir. 2019) (quoting *Ledford v. Sullivan*, 105 F.3d 354, 358-59 (7th Cir. 1997). Experts may be appointed "if necessary to help the *court* understand the issues, not to assist a party in preparing his case." *Dobbey v. Carter*, 734 Fed. Appx. 362, 364–65 (7th Cir. 2018) (emphasis in original); *see also O'Neil v. Walker*, No. 07-3241, 2008 WL 450473, at *1 (C.D. Ill. Feb. 15, 2008). Although Rule 706 does not list specific factors to be considered when determining whether an expert is warranted, the Seventh Circuit has upheld district court denials of requests for expert appointments when the issues are not complicated, when the relevant evidence can be

understood by a lay person, and/or when an expert would not add to the judge's understanding of the matter at hand. *See Smith v. Shicker*, No. 1:16-CV-1877, 2018 WL 6067249, at *1 (N.D. Ill. Nov. 20, 2018) (collecting cases).

Here, the Court does not find that a Court appointed expert is warranted in this case. To begin, Plaintiff "seeks an expert so he can develop evidence – not to help the court in understanding the evidence." *See Martin v. Redden*, No. 3:18-CV-595-JD-MGG, 2021 WL 100360, at *3 (N.D. Ind. Jan. 12, 2021). Further, the evidence regarding Plaintiff's alleged dehydration from the denial of water is not overly complicated and Plaintiff should be able to explain his symptoms as a lay person that a jury could reasonably understand. As such, the Court will deny Plaintiff's motions for a court appointed expert.

Fourth, the Court will grant Plaintiff's motion to amend his complaint. ECF No. 38. Federal Rule of Civil Procedure 15 allows amendment once as a matter of course in certain circumstances; Rule 15 also provides that a Court should freely grant leave to amend when justice so requires. Civil Local Rule 15 requires that a motion to amend a complaint notify the court of the proposed changes and the proposed amended complaint be filed as an attachment to the motion. Civil Local Rule 15 further requires that a motion must reproduce the entire pleading as amended and may not incorporate any prior pleading by reference.

Plaintiff indicates that he wishes to amend his complaint because he previously named the wrong defendants and learned the proper identify of various individuals through discovery. As such, the Court will grant Plaintiff's motion to amend the complaint and instruct the Clerk of Court to file the amended complaint, ECF No. 38-1, as the operative complaint going forward. Additionally, the Court will deny as moot Plaintiff's motion

to intervene to identify the correct defendants, ECF No. 31; Plaintiff appears to have resolved this issue with the amended complaint. The Court will screen the amended complaint accordingly.

## 2. SCREENING THE AMENDED COMPLAINT

### 2.1 Federal Screening Standard

Under the Prison Litigation Reform Act, the Court must screen complaints brought by prisoners seeking relief from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

In determining whether a complaint states a claim, the Court applies the same standard that applies to dismissals under Federal Rule of Civil Procedure 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899 (7th Cir. 2012)). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of this right

was acting under the color of state law. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The Court construes pro se complaints liberally and holds them to a less stringent standard than pleadings drafted by lawyers. *Cesal*, 851 F.3d at 720 (citing *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015)).

### 2.2 Plaintiff's Allegations

Plaintiff brings his amended complaint against Defendants Nathaniel Silva ("Silva"), Trevor Standish ("Standish"), Todd Olig ("Olig"), L. Goehl ("Goehl"), Marco Stephenson ("Stephenson"), Yana Pusich ("Pusich"), and Nathan Pach ("Pach"). ECF No. 38-1 at 1. Plaintiff alleges that he was denied the minimal amount of water needed for drinking and sanitation between May 9, 2023 and May 11, 2023. *Id.* at 2. Plaintiff was housed in the restrictive housing unit as a result of a conduct report. *Id.* On May 9, 2023, while in his cell, Plaintiff engaged in exercise activity for one hour. *Id.* Plaintiff's exercise routine consisted of 150 pushups, 150 squats, 100 sit-ups, and 150 jumping jacks. *Id.* After completing the exercise, Plaintiff was sweating profusely, felt dizzy, and was extremely thirsty. *Id.* Plaintiff went to the sink to drink water, but no water came out. *Id.* Plaintiff informed Silva that the was not working in his cell and that he was extremely thirsty. *Id.* Plaintiff showed Silva that his sink would not work; Silva told the command station to reset Plaintiff's sink. *Id.*

At approximately 2:50 p.m., Plaintiff pressed the emergency button to tell Olig that the water in his cell was not working. *Id.* Olig attempted to reset the sink and asked Plaintiff if the water was working; Plaintiff responded it was not. *Id.* at 3. At approximately 3:40 p.m., Plaintiff told Silva that the water still was not working; Silva responded that he would put in

a work order and that he had told the sergeant about the issue. *Id.* Plaintiff received a milk with his dinner; however, at approximately 3:50 p.m., he became overwhelmed with nausea, and he vomited on the floor. *Id.* At 3:59 p.m., he pressed his emergency button and said he had vomited on the floor, he was feeling sick and dehydrated, and his water was still not working. *Id.* Olig responded that he was "working on it" and shut off the intercom. *Id.*

Approximately three hours later, Plaintiff vomited a second time and felt increasingly dizzy. *Id.* Plaintiff pressed the emergency button again and repeated his issue. *Id.* Nelson again responded that a work order had been put in and that it would likely be fixed in the morning. *Id.* Plaintiff then wrote an interview/request to the sergeant to make him or her aware of the water issue. *Id.* Plaintiff never received any response. *Id.*

On May 10, 2024, Plaintiff ate a bowl of cereal with milk for breakfast. *Id.* At approximately 9:45 a.m., Plaintiff had extreme cramps and went to the toilet to defecate. *Id.* While wiping himself, he accidently got feces on his fingertips. *Id.* Without running water, Plaintiff was unable to wash his hands. *Id.* At approximately 10:08 a.m., Plaintiff pressed the emergency button and told Goehl his issues and that his water was still not working. *Id.* at 4. Goel responded that a work order had been put in and that Plaintiff should be patient. *Id.* During lunch, with feces still on his fingertips, Plaintiff had to drink more milk. *Id.* At approximately 1:45 p.m., Plaintiff experienced more stomach cramping and had to defecate again. *Id.* Plaintiff was again unable to wash his hands. *Id.* At approximately 3:00 p.m., Stephenson arrived at his cell to pass out supplies. *Id.* Plaintiff told Stephenson that he had been without water for the past twenty-four hours and that he was extremely thirsty. *Id.* Plaintiff showed Stephenson that the

water was not working. *Id.* Stephenson told Plaintiff that he would let the sergeant know and that Plaintiff would most likely be moved to another cell. *Id.*

At dinner, Plaintiff still felt nauseous, he had a severe headache a loss of appetite. He was extremely thirsty and drank his milk. *Id.* At approximately 4:20 p.m., Plaintiff pressed the emergency button to complain of extreme thirst and dehydration as a result of the water not working. *Id.* Standish replied that he was aware of the situation and that a work order was put in. *Id.* Later that evening, Plaintiff experienced severe cramps and had to defecate. Again, he was unable to wash his hands. *Id.* Plaintiff felt lethargic and lost consciousness when he laid down. *Id.* At some point later, Plaintiff felt nauseous and like he was going to vomit. *Id.* Plaintiff wrote another interview/request to the sergeant for help. *Id.* at 10. Plaintiff also wrote to Pusich for help, but he received no responses. *Id.* at 5.

On May 11, 2023, Plaintiff woke up with an extreme headache and he felt dizzy and nauseous. *Id.* At 7:30 a.m., Plaintiff told Pach that his water still was not working and that he had been without water for forty-two hours. *Id.* Pach told Plaintiff that he would try to fix the sink. *Id.* At 11:00 a.m., Plaintiff told Pach that he felt sick, was dehydrated, and needed water. *Id.* at 11. Pach responded that he could not fix the sink, and that Plaintiff would probably have to be moved. *Id.* Plaintiff laid down to save his energy and passed out. *Id.* At some point that afternoon, Plaintiff was awoken by a plumber who was fixing his sink. *Id.* The plumber told Plaintiff that no one told him about the issue until that afternoon. *Id.* Institute complaint examiner Moon initially failed to accept his properly filed inmate complaint. *Id.* Moon's supervisor confirmed that Moon erred in not

accepting the complaint. *Id.* at 6. Eventually, Warden Hepp affirmed Plaintiff's inmate complaint. *Id.*

### 2.3 Analysis

The Court finds that Plaintiff may proceed on an Eighth Amendment conditions of confinement claim against Silva, Standish, Olig, Goehl, Stephenson, Pusich, and Pach. A prisoner's claim of unconstitutional conditions of confinement is analyzed under the Eighth Amendment's cruel and unusual punishment clause. *See Farmer v. Brennan*, 511 U.S. 832, 834 (1994). A prisoner is entitled to live in conditions that do not amount to "punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Detainees are entitled to be confined under humane conditions that provide for their "basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996).

To establish a constitutional violation with respect to an inmate's living conditions, he must be able to demonstrate both: (1) the conditions were objectively so adverse that they deprived him "of the minimal civilized measure of life's necessities," and (2) the defendants acted with deliberate indifference with respect to the conditions. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer*, 511 U.S. at 834). "Life's necessities include shelter, heat, clothing, sanitation, and hygiene items." *Woods v. Schmeltz*, No. 14-CV-1336, 2014 WL 7005094, at *1 (C.D. Ill. Dec. 11, 2014) (citing *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)); *see also Budd v. Motley*, 711 F.3d 840, 842–43 (7th Cir. 2013). Depriving a prisoner of drinkable and safe water constitutes an Eighth Amendment conditions of confinement claim. *Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015).

Here, at the early pleading stage, Plaintiff has sufficiently stated an Eighth Amendment conditions of confinement claim against Silva, Standish, Olig, Goehl, Stephenson, Pusich, and Pach as relates to his access to water for drinking and sanitation. Plaintiff alleges that he was deprived of water for over forty-two hours and that these Defendants were aware of the situation and failed to provide him access to water. Although Plaintiff was provided milk during this time, Plaintiff vomited the milk and still experienced extreme symptoms as a result of the dehydration. Plaintiff also alleges his inability to clean feces off his hands for multiple days. At the screening stage, the Court therefore finds Plaintiff's allegations sufficient to proceed against Silva, Standish, Olig, Goehl, Stephenson, Pusich, and Pach for an Eighth Amendment conditions of confinement claim.

### 3.      MOTION TO APPOINT COUNSEL

The Court will deny Plaintiff's motion to appoint counsel without prejudice. ECF No. 47. As a civil litigant, Plaintiff has "neither a constitutional nor statutory right to a court-appointed attorney." *James v. Eli*, 889 F.3d 320, 326 (7th Cir. 2018). However, under 28 U.S.C. § 1915(e)(1), a "court may request an attorney to represent any person unable to afford counsel." A court should seek counsel to represent a plaintiff if: (1) he has made reasonable attempts to secure counsel; and (2) "'the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it.'" *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (quoting *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (en banc)). Whether to appoint counsel in a particular case is left to a court's discretion. *James*, 889 F.3d at 326; *McCaa v. Hamilton*, 893 F.3d 1027, 1031 (7th Cir. 2018).

While framed in terms of a plaintiff's capacity to litigate, this discretion must also be informed by the realities of recruiting counsel in this

District. When a court recruits a lawyer to represent a pro se party, the lawyer takes the case pro bono. Unlike a lawyer appointed to represent a criminal defendant during his prosecution, who is paid by the government for his work, an attorney who takes a prisoner's civil case pro bono has no promise of compensation.

It is difficult to convince local lawyers to take such cases. Unlike other districts in this Circuit, *see, e.g.*, L.R. 83.35 (N.D. Ill.), the Eastern District of Wisconsin does not employ an involuntary appointment system for lawyers admitted to practice in the District. Instead, the District relies on the willingness of lawyers to sign up for the Pro Bono Attorney Panel and, once there, accept appointments as needed. *See* Pro Bono Program, *available at*: http://www.wied.uscourts.gov/pro-bono-program.

The District is grateful to the lawyers who participate in the Pro Bono Program, but there are never enough volunteers, and those who do volunteer rarely take more than one or two cases a year. This is understandable, as many are already busy attending to fee-paying clients. Although the Pro Bono Program does provide for payment of certain litigation expenses, it does not directly compensate a lawyer for his or her time. Participants may seek attorney's fees when permitted by statute, such as in successful § 1983 cases, but they will otherwise go unpaid. The small pool of attorneys available to this District for pro bono appointments stands in stark contrast to that of the Court of Appeals, which regularly recruits counsel from across the nation to represent pro se plaintiffs on appeal. *See, e.g., James*, 889 F.3d at 323 (appointing counsel from Washington, D.C. to represent the pro se appellant); *McCaa*, 893 F.3d at 1029 (same).

Against the thin ranks of ready and willing counsel rises the overwhelming tide of pro se prisoner litigation in this District.[1] In 2010, approximately 300 civil actions were filed by prisoner litigants. More than half sought habeas corpus relief, while the remainder were § 1983 actions alleging violations of constitutional rights. Since then, the number of habeas corpus cases has remained largely steady at around 130 per year, while the volume of § 1983 lawsuits has skyrocketed. About 499 § 1983 actions were filed in 2022, and another 571 in 2023—each significantly more than the entirety of the District's civil prisoner filings from years earlier. In 2024, § 1983 actions numbered 582. All told, well over a third of the District's new case filings are submitted by unrepresented inmates. On its best day, this District has the resources to realistically consider appointment of counsel in only a tiny fraction of these cases.

Finally, it must be remembered that, when a court determines that counsel recruitment is appropriate, it can take months to locate a willing lawyer. This delay works to the detriment of all parties and contravenes Congress's instruction in Federal Rule of Civil Procedure 1 that district courts must endeavor to secure the "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Thus, looming large over each request for counsel are a court's ever-more-limited time and resources.

---

[1]Although non-prisoner pro se litigants may also be considered for the appointment of counsel under § 1915, the Court does not address that set of pro se litigants here for a few reasons. First, the volume of non-prisoner pro se litigation is miniscule compared to that brought by prisoners. Second, prisoners are much more likely to request the appointment of counsel. Paradoxically, prisoners are usually far better equipped to litigate than non-prisoners, as prisoners have access to electronic filing, institution law libraries, and fellow prisoners who offer services as "jailhouse lawyers." Yet, learning a little of the legal system means that prisoners know they can request the appointment of pro bono counsel, which they do with regularity.

With these considerations in mind, the Court returns to the question presented: whether counsel can and should be recruited to represent Plaintiff at this stage in this case. First, a court asks whether the litigant has made "reasonable" efforts to obtain his own representation. *Pruitt*, 503 F.3d at 655; *Jackson v. County of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). It is a question not often litigated; many district court judges either overlook arguably unreasonable efforts at obtaining counsel, or they impose eminently practical requirements such as the submission of evidence demonstrating that the prisoner has tried and failed to secure representation from several lawyers. *See, e.g.*, *Kyle v. Feather*, No. 09-cv-90-bbc, 2009 WL 2474627, at *1 (W.D. Wis. Aug. 11, 2009).

The first element of *Pruitt* is fairly easy to satisfy, but it is not toothless, and it is not a mere technical condition of submitting a certain number of rejection letters. If it was, then a Wisconsin prisoner litigating a § 1983 action could submit rejection letters from ten randomly selected criminal defense lawyers from Nevada and call his work complete. This cannot be. The purpose of the reasonable-efforts requirement is to ensure that if a court and private lawyers must expend scarce resources to provide counsel for a prisoner, he has at least made a good-faith effort to avoid those costs by getting a lawyer himself. To fulfill this duty, a pro se prisoner should reach out to lawyers whose areas of practice suggest that they might consider taking his case. If he learns that some of the lawyers he has contacted do not, he should reach out to others before he concludes that no one will help him.

Plaintiff indicates that he contacted three attorneys to take his case ECF No. 47. The Court is therefore satisfied that Plaintiff has met the first *Pruitt* factor.

Plaintiff's request must also, however, succeed on the second *Pruitt* question: whether the difficulty of the case exceeds his capacity to coherently present it. This assessment must be made in light of the particular capabilities and circumstances presented by each pro se litigant. *James*, 889 F.3d at 326–27. The Court of Appeals explains:

> The second step is itself grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself. The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. Ultimately, the question is not whether a lawyer would present the case more effectively than the pro se plaintiff; if that were the test, district judges would be required to request counsel for every indigent litigant. Rather, the question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself. Notably, this inquiry extends beyond the trial stage of the proceedings. The relevant concern is whether the plaintiff appears competent to litigate his own claims, given their degree of difficulty. This includes all of the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.

*Id.* (citations and quotations omitted). While a court need not address every concern raised in a motion for appointment of counsel, it must address "those that bear directly" on the individual's capacity to litigate his case. *McCaa*, 893 F.3d at 1032.

The balancing contemplated in the second *Pruitt* step must be done against the backdrop that district courts cannot be expected to appoint counsel in circumstances which are common to all or many prisoners. *See Bracey v. Grondin*, 712 F.3d 1012, 1017–18 (7th Cir. 2013); *Pruitt*, 503 F.3d 647,

656 (observing that the Seventh Circuit has "resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"); *Harper v. Bolton*, 57 F. Supp. 3d 889, 893 (N.D. Ill. 2014). Doing so would place untenable burdens on court resources. It would also turn the discretion of § 1915(e)(2) on its head, making appointment of counsel the rule rather than the exception.

Several pronouncements from the Court of Appeals appear to be in tension with this principle. First, the Seventh Circuit notes that "complexity increases and competence decreases as a case proceeds to the advanced phases of litigation." *James*, 889 F.3d at 327. It deems the "[a]dvanced phases" to include those from discovery onward. *Id.*; *McCaa*, 893 F.3d at 1032. But nearly every prisoner case proceeds to discovery, as the district court applies exceedingly lenient review during initial screening.

Second, the Seventh Circuit instructs that district courts should evaluate a prisoner's competency irrespective of the involvement of a "jailhouse lawyer." *McCaa*, 893 F.3d at 1033; *Walker v. Price*, No. 17-1345, 2018 WL 3967298, at *5 (7th Cir. Aug. 20, 2018). How courts should do this is not clear. A court rarely knows whether a filing was prepared by the plaintiff or someone helping him. And if a court does know that the plaintiff is receiving help, how can it assess his ability to litigate without knowing which portions of the filings are his work, and which come from the jailhouse lawyer? In *Walker*, the court determined that the inmate's work product decreased in quality after his jailhouse lawyer was transferred to another prison. 2018 WL 3967298, at *6. Yet a savvy prisoner, looking to secure counsel for himself, could do this on purpose, crafting his filings to downplay his own litigation capabilities. A court would have no way to assess whether the inmate is sandbagging it.

Finally, the Court of Appeals indicates that claims involving the state of mind of the defendant, such as those involving deliberate indifference, are particularly complex. *James*, 889 F.3d at 327–28; *McCaa*, 893 F.3d at 1032. Yet a government official's culpable mental state is the foundation for most constitutional claims. Indeed, it is often the defining characteristic that sets § 1983 claims apart from their state-law tort analogues. Deliberate indifference is essential to nearly all claims of cruel and unusual punishment, excessive force, mistreatment of medical needs, and First Amendment and due process violations. *See Kingsley v. Henderson*, 135 S. Ct. 2466, 2473 (2015); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hambright v. Kemper*, 705 F. App'x 461, 462 (7th Cir. 2017); *Milton v. Slota*, 697 F. App'x 462, 464 (7th Cir. 2017) ("*[N]egligently* inflicted harm does not amount to a constitutional violation.") (emphasis in original). Taken together, these claims comprise the vast majority of prisoner litigation in this District. If state-of-mind issues are generally beyond the ability of most pro se litigants to prove, then a court likely would need to appoint counsel in nearly every prisoner case. This is plainly impossible.

The guiding rule has always been that appointment of counsel is the exception rather than the rule in pro se prisoner litigation. Yet a confluence of all-too-common circumstances—discovery, jailhouse lawyers, and claims concerning state of mind—militate in favor of the appointment of counsel. As the list of reasons to appoint counsel grows, the reasons not to do so shrink. This District's resources have not kept pace.

Against this backdrop, the Court finds that Plaintiff has not presented sufficient evidence and argument showing that he cannot litigate or try this matter competently on his own. Plaintiff seeks a lawyer because

an expert is needed to interpret the medical evidence, he needs to call witnesses who are not parties, and the case is both legally and factually complex. ECF No. 47.

It is true, as Plaintiff intuits, that a lawyer would be helpful in navigating the legal system; trained attorneys are of course better positioned to successfully litigate cases. But Plaintiff's lack of legal training brings him in line with practically every other prisoner or former prisoner litigating in this Court. Further, the Court has assisted Plaintiff in this regard (as it does with all prisoner litigants) by providing copies of the most pertinent federal and local procedural rules along with its scheduling order. Thus, ignorance of the law or court procedure is generally not a qualifying reason for appointment of counsel. This case, relatively speaking, is factually and legally less complex than many other prisoner cases. As discussed above, the Court does not believe an expert is needed to explain Plaintiff's dehydration symptoms. Plaintiff has not demonstrated that his case is exceptional to require counsel. The Court will therefore deny Plaintiff's motion, without prejudice, and if the case proceeds past summary judgment, the Court will reconsider any renewed motion for counsel at a later time.

**4.     CONCLUSION**

In light of the foregoing, the Court finds that Plaintiff may proceed on the following claim pursuant to 28 U.S.C. § 1915A(b):

**Claim One:** Eighth Amendment conditions of confinement claim against Defendants Silva, Standish, Olig, Goehl, Stephenson, Pusich, and Pach for denying Plaintiff access to water.

Newly added Defendants should take note that, within forty-five (45) days of service of this Order, they are to file a summary judgment motion that raises all exhaustion-related challenges.

In light of the newly added defendants, the Court will accordingly amend the scheduling order as follows: discovery must be complete on or before **November 14, 2025**; summary judgment must be filed on or before **January 14, 2026**; all requirements from the Court's original scheduling order, ECF No. 18, remain in place.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion to compel, ECF No 23, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendants' motion to withdraw as attorney and motion for order to revoke acceptance of service, ECF No. 27, be and the same is hereby **STRICKEN**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for default sanctions and reimbursement, ECF No. 25, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to intervene, ECF No. 31, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendants' motion to rescind and motion for order for consideration of additional materials, ECF No. 34, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file an amended complaint, ECF No. 38, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the Clerk of Court shall docket the amended complaint, ECF No. 38-1 as the operative pleading going forward;

**IT IS FURTHER ORDERED** that Plaintiff's motions to appoint a medical expert, ECF Nos. 42, 49, be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to appoint counsel, ECF No. 47, be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that Defendants Nelson, Demers, and John Doe be and the same are hereby **DISMISSED** from this action because Plaintiff does not name them in his amended complaint;

**IT IS FURTHER ORDERED** that under an informal service agreement between the Wisconsin Department of Justice and this Court, a copy of the amended complaint and this Order have been electronically transmitted to the Wisconsin Department of Justice for service on Defendants **Silva, Standish, Olig, Goehl, Stephenson, Pusich, and Pach**;

**IT IS FURTHER ORDERED** that under the informal service agreement, those Defendants shall file a responsive pleading to the amended complaint, ECF No. 38-1, within sixty (60) days;

**IT IS FURTHER ORDERED** that any newly added Defendants raise any exhaustion-related challenges by filing a motion for summary judgment within forty-five (45) days of service;

**IT IS FURTHER ORDERED** if Defendants contemplate a motion to dismiss, the parties must meet and confer before the motion is filed. Defendants should take care to explain the reasons why they intend to move to dismiss the complaint, and Plaintiff should strongly consider filing an amended complaint. The Court expects this exercise in efficiency will obviate the need to file most motions to dismiss. Indeed, when the Court grants a motion to dismiss, it typically grants leave to amend unless it is "certain from the face of the complaint that any amendment would be futile

or otherwise unwarranted." *Harris v. Meisner*, No. 20-2650, 2021 WL 5563942, at *2 (7th Cir. Nov. 29, 2021) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015)). Therefore, it is in both parties' interest to discuss the matter prior to motion submissions. Briefs in support of, or opposition to, motions to dismiss should cite no more than ten (10) cases per claim. No string citations will be accepted. If Defendants file a motion to dismiss, Plaintiff is hereby warned that he must file a response, in accordance with Civil Local Rule 7 (E.D. Wis.), or he may be deemed to have waived any argument against dismissal and face dismissal of this matter with prejudice; and

**IT IS FURTHER ORDERED** that the scheduling order be and the same is hereby **AMENDED** as follows; discovery must be complete on or before **November 14, 2025**; summary judgment must be filed on or before **January 14, 2026**; all requirements from the Court's original scheduling order, ECF No. 18, remain in place.

Dated at Milwaukee, Wisconsin, this 21st day of July, 2025.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge